1  **LEILA W. MORGAN**
   California State Bar No. 232874
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, CA 92101-5030
   (619) 234-8467/Fax: (619) 687-2666
4  E-Mail: Leila_Morgan@fd.org

5

6  Attorneys for Ms. Vasquez

7

8

9                    UNITED STATES DISTRICT COURT

10                 SOUTHERN DISTRICT OF CALIFORNIA

11                  **(HONORABLE ROGER T. BENITEZ)**

12  UNITED STATES OF AMERICA,        )  Case No. 07CR3106-BEN
                                     )
13              Plaintiff,           )  STATEMENT OF FACTS AND
                                     )  MEMORANDUM OF POINTS AND
14  v.                               )  AUTHORITIES IN SUPPORT OF
                                     )  DEFENDANT'S MOTIONS
15  **MARIA VASQUEZ**,               )
                                     )
16              Defendant.           )
    _____ )

17                              **I.**

18                   <u>**STATEMENT OF FACTS**</u>[1]

19  **1.    The Stop and Arrest of Ms. Vasquez**

20        On October 29, 2007, Border Patrol Agent Luis Rivera and FBI Special Agent Murry

21  Streetman were conducting surveillance in the vicinity of the 4200 block of Logan Avenue in San

22  Diego, California.  They observed two unknown Hispanic males leave the area in a grey Ford

23  Expedition and drive to an Auto Zone parking lot on 43rd Street, San Diego, California.  A few

24  minutes later a gold Chevrolet Avalanche arrived, eventually two women who agents later identified

25  as Blanca Hernandez-Cansino and Rocio Hernandez-Casino exited the Avalanche and entered the

26  _____

27        [1] Unless otherwise stated, the "facts" referenced in these papers come from government-
    produced discovery that the defense continues to investigate.  Ms. Vasquez does not admit the
28  accuracy of this information and reserves the right to challenge it at any time.

1    Expedition.  The agents followed the Expedition to then end of the cul-de-sac located at the 4200

2    block of Logan Avenue.  At this location Blanca and Rocio Hernandez entered a blue Astro Minivan

3    bearing California license plate 3UGU958.

4        The agents followed the blue Astro van as it traveled northbound on Interstate 5, eventually

5    requesting a traffic stop of the vehicle because the female passengers were believed to be illegal

6    aliens.  Border patrol agents then stopped the vehicle and questioned the occupants regarding their

7    immigration status.  Ms. Vasquez was driving the vehicle, and identified herself as a United States

8    Citizen.  Both Blanca and Rocio Hernandez stated that they were Mexican citizens without any

9    immigration documents allowing them to enter or remain in the United States.  All three women

10   were arrested and taken to the border patrol station for processing.

11   **2.    Grand Jury and Indictment**

12       The indictment in the instant case was returned by the January 2007 grand jury.  That grand

13   jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January

14   11, 2007.  *See Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007,

15   a copy of which is attached hereto as Exhibit A.  Judge Burns' instructions deviate from the

16   instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction

17   previously given in this district in several ways.[2]

18       After repeatedly emphasizing to the grand jurors that probable cause determination was their

19   sole responsibility, *see Ex. A* at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were

20   forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or

21   not there should be a federal law or should not be a federal law designating certain activity [as]

22   criminal is not up to you."  See id. at 8.  The instructions go beyond that, however, and tell the grand

23   jurors that, should "you disagree with that judgment made by Congress, then your option is not to

24

25       [2]  *See, e.g., United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States*

26   *v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-*

27   *Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*);
     *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28       [3]  *See also id.* at 20 ("You're all about probable cause.").

say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or

'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9.  Thus,

the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree

with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns

referred to an instance in the grand juror selection process in which he excused three potential jurors.

*See id.* at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were
>
> excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

*Id.* That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

disagreement with Congress.  *See id.* at 8-9.  Thus, Judge Burns not only instructed the grand jurors

on his view of their discretion; he enforced that view on pain of being excused from service as a

grand juror.

In addition to his instructions on the authority to choose not to indict, Judge Burns also

assured the grand jurors that prosecutors would present to them evidence that tended to undercut

probable cause.  *See id.* at 20.[4]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

*Id.* (emphasis added).[5]  The district court later returned to the notion of the prosecutors and their

duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from

---

[4]    These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.

[5]    The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

1    of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to

2    you." *See id.* at 27.

3        At the border patrol station, Ms. Vasquez was read her Miranda rights and questioned

4    regarding the incident.  Ms. Vasquez made statements regarding her involvement in the offense.  On

5    November 14, 2007, Ms. Vasquez was indicted for two counts of transportation of illegal aliens in

6    violation of 8 U.S.C. § 1324(a)(I)(A)(2) and (v)(5).

7        These motions follow.

8    ## II.

9    ## THIS COURT SHOULD SUPPRESS EVIDENCE OBTAINED AS A RESULT OF AN ILLEGAL STOP

10

11       The Fourth Amendment protects the "right of people to be secure in their persons, houses

12   papers, and effects, against unreasonable searches and seizures." U.S. Constitution Amend. IV.  The

13   Fourth Amendment specifically prohibits unreasonable searches and seizures of a vehicle during

14   brief investigatory stops. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).  An officer

15   may detain a motorist only upon a demonstration of "reasonable suspicion" of criminal activity. *See*

16   *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Rodriguez*, 976 F.2d

17   592, 594 (9th Cir. 1992), *amended* 997 F.2d 1306 (9th Cir. 1993) (stating that an officer may not

18   detain a motorist without a showing of a "particularized and objective basis for suspecting the

19   particular person stopped of criminal activity" (quoting *Cortez*, 449 U.S. at 417-18)).

20       The government bears the burden of establishing that the totality of the circumstances

21   attendant to the immigration stop gave the agents reasonable suspicion that criminal activity was

22   afoot. *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002).  In determining

23   whether there was reasonable suspicion the Court "must look at the 'totality of the circumstances'

24   of the case to see whether the detaining officer has a 'particularized and objective basis' for

25   suspecting legal wrongdoing.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266 (2002)).

26   "[R]easonabl suspicion may not be 'based on broad profiles which cast suspicion on entire categories

27   of people without any individualized suspicion of the particular person to be stopped.'" *Sigmond-*

28   *Ballesteros*, 285 F.3d at 1121.  (quoting *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492

1  (9th Cir. 1994), *overruled in part on other grounds by United States v. Montero-Camargo*, 208 F.3d

2  1122, 1131-32 (9th Cir.) (en banc), *cert. denied sub nom. Sanchez-Guillen v. United States*, 531 U.S.

3  889 (2000).

4      A determination of whether an officer had "reasonable suspicion" of wrongdoing is "'not

5  readily, or even usefully, reduced to a neat set of legal rules.'"  *Ornelas v. United States*, 517 U.S.

6  690, 695-96 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)); *see also United States v.*

7  *Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989).  Rather, in making reasonable-suspicion

8  determinations, the court must consider the "totality of the circumstances" of each case to see

9  whether the detaining officer has a "particularized and objective basis" for suspecting criminal

10 activity.  *United States v. Cotrez*, 449 U.S. 411, 418 (1981); *see also United States v. Arvizu*, 534

11 US. 266 (2002) (holding that the "totality of the circumstances" inquiry of an investigatory stop of

12 a vehicle must be based on all factors, collectively, and not each in isolation).  While this inquiry

13 "includes the 'collective knowledge of the officers involved, and inferences reached by experienced,

14 trained officers,'" *Hall*, 974 F.2d at 1204 (other internal quotations omitted), this experience may

15 *not* be used to give the officers unbridled discretion in making a stop.  *See Hernandez-Alvarado*, 891

16 F.2d at 1416; *see also Florida v. J.L.*, 529 U.S. 266, 271 (2000) (finding a tip from an anonymous

17 informant did not give rise to sufficient reasonable suspicion to perform a *Terry* stop).

18     On October 29, 2007, at approximately 12:15 p.m. Border Patrol Agents Arguilez and Avila

19 initiated a stop of a blue Chevrolet Astro van traveling North on Highway 5 and driven by Ms.

20 Vasquez.  Agents Arguilez and Avila were contacted prior to initiating the stop by Border Patrol

21 Agent Luis Rivera.  Agent Rivera initially contacted the San Clemente Border Patrol checkpoint and

22 upon learning that it was not operational he requested a vehicle stop on the blue Astro van.  Agents

23 Arguilez and Avila set up at the checkpoint to assist with the stop and initiated the stop after the van

24 passed their location.

25     The government is required to establish "a particularized and objective basis for suspecting

26 the particular person stopped of criminal activity."  *See United States v. Thomas*, 211 F.3d 1186 (9th

27 Cir. 2000).  Here, there are no particularized factors from which reasonable suspicion that Ms.

28 Vasquez was involved in criminal activity could arise. According to the information provided by the

1    government, the agents here were conducting surveillance in the 4200 block of Logan Avenue in San

2    Diego, California.  During this surveillance they witnessed a grey Expedition travel to an Auto Zone

3    where the vehicle parked in the parking lot.  Shortly thereafter the agents witnessed three unknown

4    Hispanic individuals exit a gold Avalanche and enter the grey Expedition.  Agents then followed the

5    grey Expedition back to the cul-de-sac in the 4200 block of Logan Avenue.  There the two Hispanic

6    women exited the Expedition and enter the blue Astro van.  Agents then followed the Astro van as

7    it drove northbound on Highway 5, and eventually requested the traffic stop.  All of these events

8    occurred between the hours of 10:00 a.m. and 12:00 p.m.  These factors describe any number of law-

9    abiding vehicles and individuals in a highly populated area and a well-traveled highway.  Thus, the

10   agents lacked the reasonable suspicion to stop the van.  Therefore, because the agents lacked

11   reasonable suspicion, all evidence flowing from the illegal stop must be suppressed.  See Wong Sun

12   v. United States, 371 U.S. 471 (1963).

13       In order to resolve these issues, this Court should conduct an evidentiary hearing to determine

14   the extent of the violations of Ms. Vasquez's Fourth Amendment rights.

15                                                **III.**

16                            **MOTION TO SUPPRESS STATEMENTS**

17       Ms. Vasquez moves to suppress any statements made at the time of his arrest on the grounds

18   that her *Miranda* waiver was not knowing, intelligent, and voluntary.  Moreover, Ms. Vasquez

19   moves to suppress any other statements made on the grounds that those statements were not made

20   voluntarily.

21   **A.    The Government Must Demonstrate Compliance with *Miranda*.**

22       In order for any statements made by Ms. Vasquez to be admissible against her, the

23   government must demonstrate that they were obtained in compliance with *Miranda v. Arizona*, 384

24   U.S. 436 (1966).  Specifically, the government must establish that Ms. Vasquez waived her rights

25   and that any waiver of her *Miranda* rights was voluntary, knowing, and intelligent.  *See Schneckloth*

26   *v. Bustamonte*, 412 U.S. 218 (1973).  When an interrogation continues without the presence of an

27   attorney, and a statement results, the government has a heavy burden to demonstrate that the

28   defendant has intelligently and voluntarily waived his privilege against self-incrimination.  *Miranda*,

1   384 U.S. at 475.   The court must indulge every reasonable presumption against waiver of

2   fundamental constitutional rights, so the burden on the government is great. *United States v. Heldt*,

3   745 F. 2d 1275, 1277 (9th Cir. 1984).

4          In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the

5   totality of the circumstances surrounding the case. *Edwards v. Arizona*, 451 U.S. 477 (1981); *United*

6   *States v. Garibay*, 143 F.3d 534 (9th Cir. 1998).   The Ninth Circuit has held that determination of

7   the validity of a *Miranda* waiver requires a two prong analysis:   the waiver must be both (1)

8   voluntary and (2) knowing and intelligent. *Derrick v. Peterson*, 924 F. 2d 813 (9th Cir. 1990).   The

9   second prong requires an inquiry into whether "the waiver [was] made with a full awareness both

10  of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

11  at 820-821 (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)).   Not only must the waiver be

12  uncoerced, then, it must also involve a "requisite level of comprehension" before a court may

13  conclude that *Miranda* rights have been legitimately waived. *Id.* (quoting *Colorado v. Spring*, 479

14  U.S. at 573).   Unless and until *Miranda* warnings and a knowing and intelligent waiver are

15  demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

16  against the defendant. *Miranda*, 384 U.S. at 479.   The government in this case must prove that Ms.

17  Vasquez waived her rights intelligently and voluntarily.   Ms. Vasquez disputes any allegation that

18  her waiver was knowing, intelligent, and voluntarily.

19  **B.    Ms. Vasquez's Statements Must Be Voluntary.**

20         Even if this Court determines that Ms. Vasquez validly waived her *Miranda* rights, it must

21  still make a determination that any statements are voluntary.   Under 18 U.S.C. § 3501(a), this Court

22  is required to determine, whether any statements made by Ms. Vasquez are voluntary.   In addition,

23  section 3501(b) requires this Court to consider various enumerated factors, including whether Ms.

24  Vasquez understood the nature of the charges against her and whether she understood his rights.

25  Without such evidence, this Court cannot adequately consider these statutorily mandated factors.

26         Moreover, section 3501(a) requires this Court to make a factual determination.   Where a

27  factual determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings. *See*

28  *United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990).   Because "'suppression hearings

are often as important as the trial itself,'" *id.* at 610 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  Therefore, prior to admitting any alleged statements from Ms. Vasquez, a hearing must be held to determine whether the statements were voluntary.

**IV.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS*.**

**A.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California.  *See Navarro-Vargas II*, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'"  *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)).  *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ).  *See also Navarro-Vargas II*, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury,

---

[6]    *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1    id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment

2    drafted by the prosecutor." *Id. See* Niki Kuckes, *The Democratic Prosecutor: Explaining the*

3    *Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's

4    discretion not to indict was "'arguably . . . the most important attribute of grand jury review from

5    the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'")

6    (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed. 1999)).

7        Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the attributes

8    set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986).  *See id.*

9        The grand jury thus determines not only whether probable cause exists, but also
     whether to "charge a greater offense or a lesser offense; numerous counts or a single
10       count; and perhaps most significant of all, a capital offense or a non-capital offense --
     all on the basis of the same facts.  And, significantly, the grand jury may refuse to
11       return an indictment even "'where a conviction can be obtained.'"

12   *Id.* (quoting *Vasquez*, 474 U.S. at 263).  The Supreme Court has itself reaffirmed *Vasquez'*s

13   description of the grand jury's attributes in *Campbell v. Louisiana*, 523 U.S. 392 (1998), noting that

14   the grand jury "controls not only the initial decision to indict, but also significant questions such as

15   how many counts to charge and whether to charge a greater or lesser offense, including the important

16   decision whether to charge a capital crime." *Id.* at 399 (citing *Vasquez*, 474 U.S. at 263).

17       Judge Hawkins notes that the *Navarro-Vargas II* majority accepts the major premise of

18   *Vasquez*: "the majority agrees that a grand jury has the power to refuse to indict someone even when

19   the prosecutor has established probable cause that this individual has committed a crime." *See* id.

20   at 1214 (Hawkins, J. dissenting).  *Accord Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J.,

21   dissenting); *Marcucci*, 299 F.3d at 1166-73 (Hawkins, J., dissenting).  In short, the grand jurors'

22   prerogative not to indict enjoys strong support in the Ninth Circuit.  But not in Judge Burns'

23   instructions.

24   **B.    The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both**
         ***Vasquez* and *Navarro-Vargas II.***

25

26       The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room for the

27   grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its

28

1  previous decision in *Marcucci*. *Marcucci* reasoned that the instructions do not mandate that grand

2  jurors indict upon every finding of probable cause because the term "should" may mean "what is

3  probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes

4  no sense in context, as Judge Hawkins ably pointed out. *See Navarro-Vargas II*, 408 F.3d at 1210-

5  11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be

6  understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe

7  the grand jury's constitutional independence."). *See also id*. ("The 'word' should is used to express

8  a duty [or] obligation.") (quoting *The Oxford American Diction and Language Guide* 1579 (1999)

9  (brackets in original)).

10      The debate about what the word "should" means is irrelevant here; the instructions here make

11  no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply

12  may not choose not to indict in the event of what appears to them to be an unfair application of the

13  law: should "you disagree with that judgment made by Congress, then your option is not to say 'well,

14  I'm going to vote against indicting even though I think that the evidence is sufficient'...." *See*  Ex.

15  A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they

16  disagree with a proposed prosecution. No grand juror would read this language as instructing, or

17  even allowing, him or her to assess "the need to indict." *Vasquez*, 474 U.S. at 264.

18      Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a cure for

19  the instructions excesses. The *Navarro-Vargas II* majority attributes "[t]he grand jury's discretion --

20  its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of

21  its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's

22  instructions may have on a grand jury because "it is the *structure* of the grand jury process and its

23  *function* that make it independent." *Id.* at 1202 (emphases in the original).

24      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

25  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

26  unreviewability of many of its decisions -- sufficiently protects that power." *See id.* at 1214

27  (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that

28  it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

1    undermines the very structural protections that the majority believes save[] the instruction."  *Id.*

2    After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'"  *Id.*

3    (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were to

4    hold true, then the grand jurors could not possibly fulfill the role described in *Vasquez*.  Indeed,

5    "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

6    because nothing will happen if they disobey them."  *Id.*

7        In setting forth Judge Hawkins' views, Ms. Vasquez understands that this Court may not

8    adopt them solely because the reasoning that supports them is so much more persuasive than the

9    majority's sophistry.  Rather, she sets them forth to urge the Court *not to extend* what is already

10   untenable reasoning.

11       Here, again, the question is not an obscure interpretation of the word "should", but an

12   absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right

13   in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions.  *Navarro-Vargas II* is distinguishable

14   on that basis, but not only that.

15       Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly

16   states they enjoy.  He also apparently excused prospective grand jurors who might have exercised

17   that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not

18   adhere to [that] principle...."  *See* Ex. A at 8.  The structure of the grand jury and the secrecy of its

19   deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

20   their willingness to act as the conscience of the community.  *See Navarro-Vargas II*, 408 F.3d at

21   1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under *Vasquez* "serves ... to

22   protect the accused from the other branches of government by acting as the 'conscience of the

23   community.'") (quoting *Gaither v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The

24   federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

25   jury procedure," *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

26   fashioned his own rules and enforced them. The instructions here are therefore structural error.  *See*

27   *Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting).  The indictment must be dismissed.

28

1

**C.    The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

2

3    In *Williams*, the defendant, although conceding that it was not required by the Fifth

4  Amendment, argued that the federal courts should exercise their supervisory power to order

5  prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

6  required by Fifth Amendment common law. *See* 504 U.S. at 45, 51. *Williams* held that "as a general

7  matter at least, no such 'supervisory' judicial authority exists." *See id.* at 47. Indeed, although the

8  supervisory power may provide the authority "to dismiss an indictment because of misconduct before

9  the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules

10  which were carefully drafted and approved by this Court and by Congress to ensure the integrity of

11  the grand jury's functions,'" *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing*

12  such standards of prosecutorial conduct in the first instance." *Id.* at 47 (emphasis added). The

13  federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

14  jury procedure." *Id.* at 50. As a consequence, *Williams* rejected the defendant's claim, both as an

15  exercise of supervisory power and as Fifth Amendment common law. *See id.* at 51-55.

16    Despite the holding in *Williams*, the instructions here assure the grand jurors that prosecutors

17  would present to them evidence that tended to undercut probable cause. *See* Ex. A at 20.

18
19
20
21    Now, again, this emphasizes the difference between the function of the grand jury
and the trial jury. You're all about probable cause. If you think that there's evidence
out there that might cause you say "well, I don't think probable cause exists," then it's
incumbent upon you to hear that evidence as well. As I told you, in most instances,
*the U.S. Attorneys are duty-bound to present evidence that cuts against what they
may be asking you to do if they're aware of that evidence.*

22  *Id.* (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and

23  their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

24  in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

25  presented to you." *See id.* at 27.

26    This particular instruction has a devastating effect on the grand jury's protective powers,

27  particularly if it is not true. It begins by emphasizing the message that *Navarro-Vargas II* somehow

28  concluded was not conveyed by the previous instruction: "You're all about probable cause." *See* Ex.

1   A at 20.   Thus, once again, the grand jury is reminded that they are limited to probable cause

2   determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had

3   already told the grand jurors that they likely would be excused if they rejected this limitation).   The

4   instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable

5   cause, but also advises the grand jurors that the prosecutor will present it.   The end result, then, is

6   that grand jurors should consider evidence that goes against probable cause, but, if none is presented

7   by the government, they can  presume that there is none.   After all, "in most instances, the U.S.

8   Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do

9   if they're aware of that evidence." *See id.*   Thus, if the exculpatory evidence existed, it necessarily

10  would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that

11  the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

12  act in good faith in all matters presented to you." *See id.* at 27.

13         These instructions create a presumption that, in cases where the prosecutor does not present

14  exculpatory evidence, no exculpatory evidence exists.   A grand juror's reasoning, in a case in which

15  no exculpatory evidence was presented, would proceed along these lines:

16         (1) I have to consider evidence that undercuts probable cause.

17         (2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

18         evidence to me, if it existed.

19         (3)  Because no such evidence was presented to me, I may conclude that there is none.

20  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

21  evidence presented represents the universe of all available exculpatory evidence; if there was more,

22  the duty-bound prosecutor would have presented it.

23         The instructions therefore discourage investigation -- if exculpatory evidence were out there,

24  the prosecutor would present it, so investigation is a waste of time -- and provide additional support

25  to every probable cause determination: i.e., this case may be weak, but I know that there is nothing

26  on the other side of the equation because it was not presented.   A grand jury so badly misguided is

27  no grand jury at all under the Fifth Amendment.

28

1

**V.**

2

**<u>CONCLUSION</u>**

3

For the reasons stated, Ms. Vasquez requests that this Court grant her motions.

4

Respectfully submitted,

5

6 DATED:     February 21, 2008          <u>*/s/ Leila W. Morgan*</u>
                                        **LEILA W. MORGAN**
7                                       Federal Defenders of San Diego, Inc.
                                        Attorneys for Ms. Vasquez
8                                       Leila_Morgan@fd.org

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28